SUPERIOR COURT 
 
 MEETING HOUSE WAY, LLC vs. MARTHA’S VINEYARD COMMISSION

 
 Docket:
 SUPERIOR COURT CIVIL ACTION NO. 2020-33
 
 
 Dates:
 April 20, 2023
 
 
 Present:
 Paul D. Wilson Justice of the Superior Court
 
 
 County:
 DUKES, ss.
 

 
 Keywords:
 FINDINGS OF FACT, RULINGS OF LAW, AND ORDER FOR JUDGMENT
 
 

             Plaintiff Meeting House Way, LLC (“Meeting House”) proposed to develop a substantial parcel of land at 139 Meeting House Way in Edgartown (the “Property”) for residential purposes.  The proposed development required review and approval by the Defendant Martha’s Vineyard Commission (the “Commission”), the regional planning body for the island of Martha’s Vineyard.  The state legislature created the Commission in 1974, and the current version of its governing law, which I discuss at some length below, was largely enacted as Chapter 831 of the Acts of 1977 (the “MVC Act”).  
            As contemplated by the MVC Act, the Commission held public hearings and meetings on the proposed Meeting House development between May 18, 2018, and July 30, 2020, when the Commission voted to deny approval to the proposed development.  The Commission then prepared a written decision explaining its denial, which the Commission voted to approve on September 10, 2020, and which its chair signed on September 22, 2020 (the “Decision”).  Meeting House appealed that denial to this court.
            Meeting House and the Commission tried this case before me, without a jury, for six days between June 22 and June 28, 2022.  On the first day of the trial, I took a view of the Property and many other residential developments in the general vicinity of the Property in the southern portion of Edgartown.
            Nineteen witnesses testified at trial.  They included the three principals of Meeting House; the civil engineer who designed the proposed project; the Executive Director (but no members) of the Commission; and an employee, a former employee, and a volunteer public official of the Town of Edgartown.  The remaining witnesses were persons with expertise in various relevant disciplines such as real estate titles, environmental matters, engineering, planning, real estate brokerage, architecture, and residential construction.  The parties introduced 132 exhibits into evidence, many of them quite thick, so that the exhibits filled a banker’s box.  At various points before and during the trial, the parties stipulated to many facts, or did not dispute facts proffered by the opposing party.
            At the conclusion of the testimony, the parties asked for leave to have a transcript of the trial prepared, and then to submit post-trial filings.  I granted that request.  Meeting House eventually filed three post-trial briefs and requests totaling 107 pages, while the Commission submitted one post-trial brief of 50 pages (not including attachments).  The last post-trial filing, a corrected brief, reached me in November 2022.
            Based on the trial record, and after having considered the arguments of counsel, I will now affirm the Decision of the Commission and will order entry of judgment in its favor.
Findings of Fact
            Based on all the credible evidence presented at trial, and all the reasonable inferences drawn from that evidence, I find the following facts.
1.  The Property
            The Meeting House Property consists of 54.26 acres of land in the Town of Edgartown, one of the six municipalities on the island of Martha’s Vineyard.  The Property is roughly rectangular.  It is located southwest of the village, or downtown area, of Edgartown.  The Property is approximately one-half mile south of the Edgartown-West Tisbury Road, the main road running almost directly west out of the village of Edgartown and crossing the island in an east-west direction.  The location of the Property in reference to the rest of Edgartown is shown on Exhibit 103, where the Property is outlined in red.
            The Property consists of five adjacent lots, each of them approximately 10 to 12 acres in size.  The Property directly abuts only one public road, Meeting House Way, a paved, two-lane public way that runs along the southern boundary of the Property.[1]  Another two-lane public way, Meshacket Road, leads south from Edgartown-West Tisbury Road and comes very close to touching the Property at its northwest corner.  Connecting Meeting House Way and Meshacket Road near the northwest corner of the Property, and running along the western boundary of the Property, is Division Road, an unpaved, one-lane private road owned by Meeting House and three of its neighbors across the road.  One of those neighbors is the Town of Edgartown, which is proposing a 40-unit affordable housing development for its property across Division Road.  Another such neighbor has obtained approval from the Commission to subdivide its eight-acre property across Division Road into five buildable lots.
            The other two boundaries of the Property, to its east and to its north, do not abut roads that could provide vehicle access, although there are dirt paths along or near those property lines in certain places.  Exhibit 56 shows the Property, these nearby public and private ways and paths, and the proposed final iteration of the design of the residential lots and their access from Division Road.
            Meeting House purchased the Property for $6.6 million in 2018.  A year earlier, the previous owner of the Property offered to sell it to two entities that own much conservation land on Martha’s Vineyard, the Martha’s Vineyard Land Bank and the Sheriff’s Meadow Foundation.  The record contains no details about the price or other details of those offers.  Both organizations declined to purchase the Property.  
            The Decision states, and I find, that the Commission’s most recent regional plan, the Island Plan of 2010, placed the Property in an area labeled Somewhat Suitable for Development.  As for municipal zoning, the Property is in an R-20 residential zoning district, which requires that building lots contain one-half acre.  Directly across Meeting House Way to the south of the Property there begins an R-120 residential zoning district, where a building lot must be three acres in size. 
            Much of the Property consists of pine and oak forest, although the Property also contains at least one meadow.  Along its southern border, the Property is burdened by a 200-foot-deep easement within which construction and site work are prohibited, thereby creating a wooded visual buffer from Meeting House Way.  
            The Property is currently undeveloped.  The parties agree[2] that the Property is unsuitable for industrial or commercial development.  They also agree that certain portions of the Property are appropriate for a certain level of residential development, but they disagree on the appropriate scale of development.   
            The Property has no ocean or pond views.  At its closest point, the Property is approximately 1 mile from the ocean, although it is closer to the Edgartown Great Pond,  approximately one-quarter mile away at its closest point.  The Property is not a wetland, nor, as far as the record shows, does it contain any buffer zones for any natural features protected by the Wetlands Protection Act.  The Property is not used for agricultural purposes, is not conservation land, and is not adjacent to conservation land.  The Property has no significant historical or archaeological value.  The parties agree that the Property is “ordinary” Vineyard land for purposes of valuation.  Plaintiff’s Subsidiary Facts filed June 14, 2022, Paper 30, at ¶ 46 and response.[3]
            In the recent past, portions of the Property were used for the storage of heavy equipment, and unknown persons dumped unwanted appliances, household goods, and other trash at certain places on the Property.  While taking the view, I observed signs of small encampments, presumably of homeless people, on the Property.
            To reach the nearest bus stop, a resident of the Property would walk approximately one-half mile up Meshacket Road from the northwest corner of the Property to where that road intersects Edgartown-West Tisbury Road.  However, the local transit authority anticipates creating a bus stop in front of the Property on Division Road when the Town of Edgartown constructs its planned 40-unit affordable housing development across Division Road.
            In the immediate vicinity of the Property to the north, east and west, there are residential developments containing many half-acre lots.  Exhibit 2 is a map that shows some of those subdivisions.  One of the nearest is the Island Grove development, a quarter mile or less to the northwest of the Property, consisting of 149 homes.  Island Grove was begun in 1975, when Edgartown was not a member of the newly created Commission.  Edgartown Estates, also nearby but to the east of the Property, contains 136 developed lots.  It was begun in 1973, before the passage of the MVC Act and the creation of the Commission.  I observed these two developments, and others, when we took our view.  Most houses in these subdivisions are smaller than the homes that would have been allowable on the Property had Meeting House obtained approval.  
            Much testimony focused on two relatively recent subdivisions in Edgartown, because Meeting House suggested that the homes in its development would have been approximately the same size as the homes in those subdivisions.  One was the Jordan Way development, where most of the homes are nearly as large as the maximum house size proposed by Meeting House for its Property.  See Exhibit 123.  But the Commission did not consider that subdivision, because it contains only nine houses, just below the threshold for a Development of Regional Impact requiring Commission approval at the time the subdivision was created.  
            The other recent subdivision was The Field Club, where in 2006 the Commission approved the construction of a subdivision of 25 homes as part of a private athletic club also containing a clubhouse and athletic facilities.  Some of the houses at The Field Club are slightly larger, and some are approximately the same size, as the houses that might have been built on the Property, had Meeting House obtained its approvals.  See id.  The Field Club development, however, is not comparable to the Meeting House proposal (or, as far as the record shows, to any other recent subdivision on Martha’s Vineyard), because the development of The Field Club accomplished a particular public good, in that its construction involved reclaiming an unsightly abandoned gravel pit.
2. The Meeting House Proposal  
            During its two-plus years before the Commission, the Meeting House proposal evolved, based on what the representatives of Meeting House heard from the Commission, the Town of Edgartown, and others.  
A. Some Aspects of the Meeting House Plan that Never Changed
            Certain basic aspects of the development plan have remained unchanged since the initial proposal.  For example, Meeting House proposed then, and still proposes, to pave Division Road and to use it for access to its proposed residences.  To discourage use of Division Road as a shortcut and to keep traffic speeds low, it would remain one lane wide.  As another example, Meeting House has always planned to connect its residences to the municipal water system of the Town of Edgartown rather than relying on well water.
            Similarly, Meeting House has always planned to pipe its wastewater to the Edgartown wastewater treatment facility, rather than using septic systems.  The Property is in the watershed of the Edgartown Great Pond, which the Massachusetts Department of Environmental Protection classifies as “impaired” with regard to nitrogen levels.  As a result, handling the development’s wastewater through the municipal wastewater treatment facility would be beneficial to Edgartown Great Pond, because it would greatly reduce the amount of nitrogen from the Property that would reach Edgartown Great Pond.  Similarly helpful in this regard would have been certain covenants that Meeting House intended to impose on each lot, including a limit of 4,000 square feet of fertilized lawns and gardens and a requirement that homeowners use only reduced-nitrogen, slow-release fertilizers.  In addition, as more fully described below, Meeting House offered to hook up 7 to 12 existing houses in a nearby subdivision to its wastewater system so that those houses would no longer need to use septic systems, and also to allow the Town of Edgartown to connect its future 40-unit affordable housing development across Division Road to the Meeting House sewer system.  
            The municipal wastewater treatment facility has adequate capacity, now and for the foreseeable future, to handle all of this wastewater.  The only evidence of a possible future capacity issue was Exhibit 40, a report prepared by a consulting firm for the Town of Edgartown, which foresaw a capacity issue if every single lot abutting a sewer line in Edgartown were to be built out.  I find, however, that such an intense buildout is unlikely to occur – as illustrated by this very case.  In any event, during the first day of trial, the parties stipulated that the Meeting House proposal satisfied the Commission’s Water Quality Management Policy.
            One other aspect of the proposal that remained unchanged concerned the use of site-generated renewable energy generation to meet electrical needs.  The residences would be equipped with solar panels “which should result in a net zero power consumption for each home in the subdivision.  Energy use from the power grid would be net zero.”  Exhibit 8, Architectural Design Guidelines, at 36.  In its Decision, the Commission noted that Meeting House was setting a good precedent in this regard, and in pretrial proceedings the parties stipulated that energy was not a factor in the Commission’s decision to deny approval to the project.  
B. The First Meeting House Plan
            In 2018, Meeting House began the permitting process by submitting to the Edgartown Planning Board an initial development plan for the subdivision of the Property into 36 lots.  The Planning Board recognized that the proposed development was large enough to qualify as a Development of Regional Impact under the MVC Act.  Therefore, as required by that law, the Planning Board did not act on the application for subdivision approval, instead referring the application to the Commission for its consideration.  The Commission designated the initial proposal as DRI #682, and opened a public hearing.
            Meeting House intended to sell its lots to others who would build homes on them, although, if the lots did not sell fast enough, Meeting House might have decided to build a couple of “spec homes” in the development to offer for sale.  Testimony of Meeting House principal Edward Champy, Tr. 4 at 21.[4]  Complicating matters somewhat was an Edgartown bylaw that would have limited construction on the Property to a maximum of eight houses annually. 
            Meeting House proposed to impose covenants on the lots to limit the size of the houses that its buyers could build.  The original Meeting House limitation would have permitted a house of 9000 square feet of livable space, but Meeting House lowered that limit in stages down to 3600 square feet in a main structure, and an additional 400 square feet above a detached garage.
            Meeting House hoped that its building lots would sell for $1 million apiece or thereabouts.  Based on the expert testimony at trial, I find that this was a reasonable assumption.  According to Meeting House, its “target audience” would be “[d]efinitely both” “seasonal people” and “year-round people.”  Testimony of Meeting House Principal Douglas Anderson, Tr. 5 at 231.  However, only a limited number of “year-round people” could afford to pay (1) $1 million for a building lot, and then (2) much more than that, as described below, to build a house on that lot.  Moreover, even among the “year-round people” with such assets, the number in the market at any given time to build a new house, with no water views, is not large.  On the other hand, the “audience” of “seasonal people” possessing the required assets who are seeking to buy or build a second home on the Vineyard is considerably larger.  I find, therefore, that the purchasers of the Meeting House lots would be largely, but not entirely, “seasonal people” from off island.
            I also find, based on expert testimony, that residential construction costs for large, high-quality homes on Martha’s Vineyard at the time of the Commission’s hearings were about $700 per square foot of livable space.  Simple math suggests, therefore, that it would cost about $2,520,000 to build a 3600 square foot house, the maximum size permitted in the covenants that would have governed the Meeting House development (not including the construction of the garage and another 400 square feet of livable space above it, as also permitted by the proposed covenants).  While the actual costs would depend on choices made by individual homeowners as they constructed these new homes, it is certainly fair to say that, when constructions costs were added to the cost of the lots, homes in the Meeting House development would cost their owners in the range of $3 million to $4 million.  
            Meeting House did not expect that all the owners would build their houses out to the maximum square footage allowed by the covenants.  The expectations of Meeting House in this regard are at odds with credible expert testimony that people seeking houses on the Vineyard over the last 10 or 15 years have been looking for larger homes.  These expectations are also at odds with other credible expert testimony suggesting that, because these lots would have no water views, the economic value of homes built on the Property, either for occupancy by the owners or for seasonal rental, would spring from the size of the homes and the amenities provided there, which would encourage lot purchasers to build houses at the maximum allowable size and with expensive features.  If an owner built in this fashion – and I find that such buildouts would be the norm – the “market information” gathered by Meeting House suggested that the cost of the land plus the house would be in the range of $2.7 million to $2.8 million, according to Meeting House principal Douglas Anderson.  Tr. 5 at 231.  I find that this cost figure to be low, based on the simple mathematical calculation earlier in this paragraph.
C. The Second Meeting House Plan
            The Commission held several sessions of its public hearing on the first Meeting House plan.  Meeting House also appeared before the Commission’s Land Use Planning Committee, and met with the Commission’s professional staff, which submitted recommendations to the Commission.  As a result of these hearings and meetings, in 2019 Meeting House submitted a revised plan, which the Commission designated as DRI #682A.  
            One factor requiring modification of the original Meeting House plan was the designation of approximately 25.2 acres of the Property as “Priority Habitat” for a state-endangered species, the Imperial Moth.  The Massachusetts Natural Heritage and Endangered Species Program made this designation after Meeting House had prepared and filed its original plans.  Although this designation did not make entirely unbuildable the land designated as Priority Habitat, development of Priority Habitat does involve additional permitting and financial consequences that Meeting House decided to avoid by redesigning its proposed development to disturb as little Priority Habitat as possible.
            This 2019 plan reduced the number of building lots from 36 to 28.  These lots were placed in two clusters on the western side of the Property, each cluster accessed by a cul-de-sac leading off Division Road.  Because nearly half of the Property had by then been designated as Priority Habitat for the Imperial Moth, this plan contemplated preserving 30.1 acres as an “Open Space” lot.  This plan also created no-cut buffer zones around the edges of the house lots to preserve natural habitat there.  This 2019 plan, DRI #682A, is Exhibit 20.
            A Commission policy required developers of market rate residential housing to make certain financial contributions toward the construction of affordable housing.  Meeting House was always willing to make those contributions.  
            However, its original 2018 plan, DRI #682, did not propose construction of any affordable units on the Property.  Including affordable townhouses in the project would subject Meeting House to yet another permitting proceeding.  Because a townhouse arrangement would involve the construction of more than one residence on one lot, the Edgartown Planning Board would have to issue a special permit.  Project opponents could then appeal that special permit to the courts.  Meeting House was not anxious to invite such appeals.  Nonetheless, as discussions with the Commission progressed, Meeting House became convinced of the wisdom of offering to build affordable units as well.  Therefore the 2019 plan, DRI #682A, showed a 29th building lot, to be occupied by 10 affordable townhouses, ranging in size from about 800 square feet to about 1100 square feet of living space.
            Further hearings and meetings ensued.  At one of them, attended by many of the Commissioners, a straw vote was taken, and the Commissioners’ nays outweighed the yeas.  Therefore Meeting House requested that the Commission reopen the public hearing to permit it to submit another revised plan, as well as a list of “Offers” that Meeting House was willing to make.  See Exhibit 5.  The Commission assented, and reopened the hearing.
D. The Final Meeting House Plan
            In 2020, Meeting House submitted the final version of its plan, which the Commission designated as DRI #682B.  That plan is Exhibit 56.  This final plan was similar to the 2019 plan, in that it contained 28 single-family house lots in two clusters, but the 29th lot, devoted to affordable housing, had a more complex road system that would now serve 14, as opposed to 10, affordable townhouses.  Even at this size, with fewer market-rate house lots than the original 2018 proposal, the 2020 plan proposed the largest residential development to come before the Commission in at least a decade.
            Along with that 2020 plan, Meeting House submitted several other documents, apparently the “Offers” that its counsel referred to in asking the Commission to reopen the hearing.  Those documents included:
1. A “Meeting House Place Narrative,” updated April 20, 2020, consisting of nine pages, which contained, among other things: (a) a one-page summary of the key building restrictions that would be contained in the proposed Declaration of Covenants that I describe below; (b) a multi-element affordable housing offer that I also discuss below; (c) additional offers concerning energy and sustainability; (d) an offer to allow public access to pedestrian paths on the Property; (e) brief discussion of an archaeological study showing no impacts; (f) brief discussion of an updated traffic study; and (g) a report that the Massachusetts Natural Heritage and Endangered Species Program had made a “preliminary informal determination” that the current development plan “will result in significantly less disturbance to state-listed species habitat” and “would be unlikely to result in a Take of state-listed species or require a Conservation & Management Permit to proceed.”  Exhibit 24 (regulatory citations omitted).  
2. Proposed “Architectural Design Guidelines” consisting of 37 pages.  See Exhibit 8.
3. A proposed “Declaration of Covenants, Conditions and Restrictions for Meeting House Place,” consisting of 26 pages plus attachments.  This document would have imposed restrictions on how the individual lots could be developed and used.  Among many other restrictions, this document limited each lot to one house of up to five bedrooms and a maximum of 3600 square feet of livable space, and required construction of a two-car garage which, if it was in a separate structure, could have 400 square foot bedroom above it.   This document also outlined no-cut buffer zones and building envelopes that had the effect of limiting where structures, pools, patios, and the like could be built, in order to preserve native vegetation.  See Exhibit 7.  The effect of those covenants, the parties agree, would have been to preserve an additional 9.2 acres of open space in setbacks and vegetated areas throughout the Property.  However, I find, based primarily on the credible evidence of the Commission’s expert witness Thomas Chase, that these vegetated areas and setbacks, spread throughout the western half of the site primarily at the edges of house lots, provided only fragmented habitat.  Those areas were not ecologically useful for many forms of wildlife, and in fact endangered some animals and insects by attracting them to too-small vegetated areas close to driveways and lawns where they might be harmed by automobiles, lawnmowers, or predators that picked them off as they tried to cross lawns.  I also find that, despite the efforts of Meeting House to limit the footprints of houses and outdoor amenities on each lot, building 28 large homes and 14 townhouses and their access roads and driveways would require clearing many trees that sequester carbon dioxide and serve other environmentally useful functions.
            Other relevant details of this 2020 final plan, some of which were also contained in the documents described above, included an offer to create 200-foot vegetated buffer zones between the developed areas and the two public ways near the Property.  Deed restrictions already required a 200-foot wooded buffer zone between developed areas of the Property and Meeting House Way, and Meeting House offered to provide a similar buffer to Meshacket Road.  In addition, Meeting House agreed to hook up to its sewer system, at its expense, at least 7 and up to 12 houses on Hotchkiss Lane, adjacent to the Property, that were currently using septic systems, thereby moving their waste to the Edgartown wastewater treatment facility.  Meeting House also offered to run a stub off its sewer system to the property line of the Town of Edgartown’s proposed 40-unit affordable housing development across Division Road.  This would allow the Town to hook those 40 future units, too, into the municipal wastewater treatment facility through use of the Meeting House sewer system (although the Town would also have the option of connecting to the municipal wastewater system at Meshacket Road if it preferred that route).  
            E.         The Affordable Housing Offer
            The final Meeting House plan dealt with affordable housing in several ways.  
            Some of the Meeting House offers in this regard were financial.  First, Meeting House offered to pay a total of $1,112,200 to the Edgartown Affordable Housing Committee if it obtained all necessary approvals for its proposed 28 market rate residential lots.  The receipt of all permits would trigger a first payment of $490,000, and then Meeting House would pay an additional amount to the Affordable Housing Committee as each lot sold, for an additional total of $622,200.  The parties agree that the total amount of $1,112,200 is 13% more than would have been required under the Commission’s Affordable Housing Policy.  The Meeting House planning expert credibly testified, and I find, that this amount would have been sufficient at the time of the Commission’s hearing to build three to four affordable units, based on data from the Massachusetts Housing Partnership concerning recently developed affordable housing on Martha’s Vineyard.  But, of course, the Meeting House proposal would not have provided the majority of the promised funds immediately, but rather over the course of several years, as lots sold.  
            Next, Meeting House proposed that the Dukes County Regional Housing Authority (or a similar agency designated by the Commission) would receive a 1% levy on all future sales of any of the 28 single-family lots, to be paid by the future seller and buyer.  Meeting House would impose this obligation on future lot owners in the deeds through which it made the original conveyances of the lots.  Id.  
            In addition to these financial arrangements, Meeting House also offered to construct and sell townhouses – now 14 townhouses rather than the 10 townhouses proposed in the 2019 plan – at below market rates “for first-time homebuyers and ‘empty-nesters,’” as Meeting House put it.  Exhibit 24 at 2.  Meeting House was attempting to create workforce housing whose purchase price would be internally subsidized from the proceeds of sales of the 28 market rate housing lots, rather than being subsidized through governmental affordable housing subsidy programs.  To accomplish this, Meeting House offered to construct 10 two-bedroom units priced at $387,000, and four one-bedroom units priced at $359,000.  Meeting House set those sales prices after discussions with the Edgartown Affordable Housing Committee, aiming at a price that would be affordable to someone making a certain percentage of the Area Median Income on Martha’s Vineyard.  These prices would be increased by 3.5% per year until the date of actual construction, to account for inflation.  
            Meeting House would sell these units only to “Qualified Buyers.”  A Qualified Buyer would be either:  (a) “a first-time homebuyer who has lived and worked on Martha’s Vineyard full-time, year-round for at least five years”; or (2) “a person that is at least 60 years of age and has been a full-time, year-round resident of Martha’s Vineyard for at least 15 years and at the time of application for a unit does not own any other real property on Martha’s Vineyard or elsewhere.”  Id. at 2-3; see also Exhibit 23, two letters from counsel for Meeting House to the Commission containing some or all of the terms recited in Exhibit 24.  
            The Meeting House offer did not impose any income or asset limitations on Qualified Buyers.  In fact, the Meeting House expert planner credibly testified that this “definition of qualified buyers is unique to that offer and is not in conformance with other affordable housing programs,” in particular because it did not “look[] at the income of buyers.”  Testimony of Roberta Cameron, Tr. 2 at 238-239.  As a result, as a Meeting House principal conceded in his testimony, “someone [in] the over-60 pool could sell a house on the Vineyard for a million dollars and still qualify to purchase one of these townhouses, as long as they didn’t own other property.”  Testimony of Edward Champy, Tr. 4 at 49.  The Meeting House proposal contemplated that the Edgartown Planning Board would “certify the list of Qualified Buyers,” and, if there were more Qualified Buyers than available units, the Planning Board would conduct a lottery.  Exhibit 24 at 3.
            The Meeting House offer said that the townhouse “must be occupied as the owner’s principal residence,” and that the owner “may not rent the townhouse.”  Id.  The Meeting House offer did not mention any mechanism for enforcing these restrictions, such as deed provision.  
            The Meeting House proposal did not require the Qualified Buyer of a townhouse to resell the townhouse only to another Qualified Buyer.  Meeting House did not propose any limitation on the sales price when the original Qualified Buyer sold the townhouse to someone else.  (The 3.5% annual price increase limitation would only apply “until such time as all units are constructed.”  Id. at 2.)  According to credible testimony of the Meeting House planning expert, creators of affordable housing generally utilize “more conventional covenants or deed restrictions that protect the [affordability of the] housing in perpetuity or for a long time.”  Testimony of Roberta Cameron, Tr. 2 at 254.  A template for such deed restrictions limiting the price at which the original Qualified Buyer, and future owners, could resell the unit was readily available, this witness conceded, and I find, in “the state’s model deed restrictions that would ensure that it remains affordable in perpetuity.”  Id. at Tr. 2 at 239.  Meeting House proposed no such deed restrictions or covenants.
            Finally, the Meeting House proposal did not discuss how Meeting House would comply with fair housing laws in marketing the affordable units.  Id. at Tr. 2 at 256.  This issue assumes particular significance because a Qualified Buyer was defined as a person who had resided on Martha’s Vineyard for either 5 or 15 years, and I find, based on the unrebutted testimony of the Meeting House expert planner, that “the racial composition of Martha’s Vineyard is not reflective of the population overall.”  Id. at Tr. 2 at 250.
            These units would be built out as Meeting House sold its market rate building lots, in that Meeting House would “offer” the first two townhouses to “Qualified Buyers” after it sold its first five market rate building lots.  The same ratio would apply as Meeting House sold out its first 20 building lots, triggering “offers” to build the first eight affordable townhouses. Then the ratio would increase, with Meeting House extending “offers” to build three townhouses after it sold lots 21 through 25, and the final three town houses after it sold lots 26 through 28.  Meeting House would not actually construct any townhouse, however, until a Qualified Buyer had been identified and had “accept[ed] the offer” to purchase that townhouse.  Id. at 2.
            Meeting House had settled on these particular affordable housing aspects of its plan after consulting the Commission and its staff and Edgartown town officials, including the Edgartown Affordable Housing Committee.  Meeting House itself had no particular point of view about the appropriate price points or the income levels that would support those price points, or about the target audience and how to define that audience in the definition of Qualified Buyer.  Meeting House essentially viewed the affordable housing townhouses as a means to the end of obtaining Commission approval.  As one of its principals testified, “We just were offering them [the affordable units] to get approved.”  Testimony of Edward Champy, Tr. 4 at 30.  For example, when I asked this witness about the failure of Meeting House to suggest resale restrictions, he responded that “our intention was to appease the Martha’s Vineyard Commission,” id. at Tr. 4 at 29, presumably by doing whatever the Commission suggested, on that issue and others.
            The final proposal did not entirely satisfy anyone.  Although Meeting House had increased the affordable townhouse component of the development from zero townhouses to 10 townhouses to 14 townhouses, its principals believed that the Commission actually wanted more affordable housing than Meeting House was offering.  The Edgartown Affordable Housing Committee was happy with the financial contributions, but wanted more of that money to be paid up front, rather than over time as the market rate lots sold.  The Town of Edgartown did not believe that its Planning Board had the obligation, or the expertise, to certify Qualified Buyers of the affordable units, or to conduct a lottery if one proved necessary; the chair of the Edgartown Affordable Housing Committee credibly testified that those functions were usually carried out by the Dukes County Regional Housing Authority.  Commission staff, and perhaps others, were concerned that requiring Qualified Buyers to have resided on the Vineyard for 5 or 15 years would violate fair housing law.  See, e.g., Exhibit 108.  Meeting House believed that those issues could be hashed out with the Edgartown Planning Board when Meeting House returned to that Board for subdivision and special permit approvals once it had obtained the approval of the Commission.
4. Undeveloped Land Remaining on Martha’s Vineyard
            The parties devoted considerable energy to presenting evidence about how many large, developable parcels remain on Martha’s Vineyard.  The Commission catalogued 60 parcels across the island that consisted of 20 acres or more but whose assessed value was $100,000 or less, inferring from the low assessment that there was no house on the parcel.  However, only eight of those 60 parcels, the Commission suggested, occupy land that that the Commission listed as suitable for residential construction when it published its most recent planning document, the Island Plan, in 2010.  (The Island Plan is Exhibit 49.)
            I find that this analysis considerably understates the number of parcels on the island that could theoretically be developed as sizable subdivisions.  For one thing, many 20-acre parcels that already contained one house, and therefore likely had an assessed value of more than $100,000, could be subdivided.  Meeting House expert witness Slater Anderson credibly testified that the Jordan Way subdivision of nine sizable houses on half-acre lots was one recent example of this phenomenon.  Tr. 5 at 144.  Unfortunately, this Meeting House expert witness, while credibly explaining that the Commission’s number was low, could not himself say how many large developable parcels existed on the island.  Tr. 5 at 148.  Nor is the rest of the record sufficient to allow me to make a finding that the number of such lots remaining of the Vineyard.  But number of potentially developable large lots is probably irrelevant anyway, because one of the Meeting House principals pointed out, and I find, that “there aren't many parcels of this size that come available."  Testimony of David Blatt, Tr. 5 at 68-69.
5. Current Housing Stock on the Island
            According to federal census data, the population of Dukes County increased by 25% between 2010 and 2020, from 16,535 to 20,600.  As the parties have agreed, in that same decade, the island’s housing stock grew by less than 2%, from 17,188 to 17,530 units.  See Exhibit 73. 
            In 2020, 51% of the residences on Martha’s Vineyard were occupied year-round.  See Exhibit 73 at second-last page.  This percentage was higher than it had been in the recent past.  The remaining 49%, I infer, were seasonal residences.  Much of the most recently built housing on the island has been devoted to seasonal residences.  See Exhibit 98, Martha’s Vineyard Housing Needs Assessment of December 2020 created by the Commission, at 3.  
            There was considerable testimony comparing the size of the homes proposed for the Property with the current housing stock in the vicinity of the Property and across the island.  As described above, I find that purchasers of the lots on the Property are likely to build houses of 3600 square feet, to maximize the value of their financial investment, particularly because those houses will not have the financial benefits that accrue to homes with ocean or pond views.  At that size, the houses will be larger than most, but certainly not all, of the single-family homes currently existing on the island.  I also find that homes constructed more recently on the island are larger than those constructed in the more distant past.
            The parties agree that between 2010 and 2021, the average single-family home sales price on Martha’s Vineyard rose from $767,143 to $2,229,621.  Over that same period, the average single-family home sales price in Edgartown rose from $826,197 to $3,953,625.  Again over that same period, the median (as opposed to the average) single-family home sales price rose on the island as a whole from $549,250 to $1,325,000, and in Edgartown from $665,000 to $2,780,000.
            The average weekly wage on the island in 2019 was $1094.  That figure is 70% of the average wage in the Commonwealth at the time.  That average wage would not be sufficient to support a mortgage loan for a large majority of the homes on Martha’s Vineyard.  In fact, a study by the federal Department of Housing and Urban Development found that, as of 2017, 41% of the households on Martha’s Vineyard were spending more than 30% of their income on housing, and 21% of all households there were spending more than half of their income on housing. 
Rulings of Law
            The Commission voted to deny the Meeting House application, and directed the Town of Edgartown not to grant any permits to Meeting House for the project.  The Decision is Exhibit 1.
            I will discuss the bases for that Decision in my Rulings of Law, below.  My analysis of specific issues will, of course, involve discussion of the facts.  To the extent that I mention a fact below in my Rulings of Law that is not contained in my Findings of Fact above, I am making an additional Finding of Fact.  
1. The Law That Governs MVC Review of a Development of Regional Impact 
            The responsibilities and powers of the Commission are set out in the MVC Act.  The MVC Act in its current form was enacted as Chapter 831 of the Acts of 1977.[5]
            The MVC Act created the Commission as a regional land-use planning entity.  The MVC Act instructs the Commission to protect the health, safety and general welfare of island residents and visitors by preserving and conserving for the enjoyment of present and future generations the unique natural, historical, ecological, scientific, and cultural values of Martha’s Vineyard which contribute to public enjoyment, inspiration and scientific study, by protecting those values from development and uses which would impair them, and by promoting the enhancement of sound local economies.
MVC Act § 1.  
            One way in which the Commission carries out this purpose is by ruling on applications to construct projects that, “because of their magnitude or the magnitude of their effect on the surrounding environment, are likely to present development issues significant to more than one municipality.”  MVC Act § 12.  Such projects are called Developments of Regional Impact.  A subdivision of the size proposed by Meeting House qualifies as a Development of Regional Impact.
            If any town board on Martha’s Vineyard receives an application to construct a Development of Regional Impact, it must refer the application to the Commission.  MVC Act § 13.  The Commission then analyzes the application through its regional planning lens, including by holding a public hearing.  The Commission can deny the application, or approve it with or without conditions.  If the Commission issues an approval, the municipal board where the application originated is then free to decide whether to issue the relevant municipal approval.  MVC Act § 14.
            The MVC Act provides for judicial review of Commission decisions.  On appeal, “The court shall hear all pertinent evidence and shall annul the determination of the commission if it finds that said determination is unsupported by the evidence or exceeds the authority of the commission, or it may remand the case for further action by the commission or may make such other decree as is just and equitable.”  MVC Act § 18.  This standard of review harkens back to the statutorily mandated procedure for court review of decisions of a municipal zoning board in M.G.L. c. 40A, § 17.  Noting the similarity, the Appeals Court has looked to Chapter 40A zoning appeal cases for guidance in considering an appeal of a Superior Court decision under the MVC Act.  See Tisbury Fuel Serv., Inc. v. Martha’s Vineyard Comm’n, 68 Mass. App. Ct. 773, 774-776 (2007).
            The “unique form of judicial review applicable peculiarly to zoning cases,” and also applicable to an appeal of a Commission decision, requires that “the court find[] the facts de novo and measure[] the legal sufficiency of the Commission decision against the court’s findings of fact rather than against those found by the Commission.”  Id. at 776, quoting Green v. Bd. of Appeals of Provincetown, 26 Mass. App. Ct. 469, 473 n.6 (1988).  The court then must affirm the decision of the Commission unless it finds that the Commission decision “was ‘based on a legally untenable ground, or unreasonable, whimsical, capricious or arbitrary.’”  Tisbury Fuel Serv., 68 Mass. App. Ct. at 776, quoting MacGibbon v. Bd. of Appeals of Duxbury, 356 Mass. 635, 639 (1970).
            The MVC Act permits the Commission to approve a project only if it can make five specified findings.  At the heart of this case is the first of those five required findings: that “the probable benefit of the proposed development will exceed the probable detriment as evaluated pursuant to section fifteen.”  MVC Act § 14(a).  Section 15, in turn, requires the Commission to consider eight non-exclusive factors in weighing the probable benefits and detriments.  MVC Act § 15.  
                  In Tisbury Fuel Service, as in today’s case, the plaintiff applicant’s primary argument was that the MVC had acted unreasonably in weighing the probable detriments of the proposed project against its probable benefits.  Tisbury Fuel Serv., 68 Mass. App. Ct. at 777.  Based on the de novo factual findings of the Superior Court judge, both that judge and the Appeals Court evaluated the probable benefits and detriments of the proposed project, see MVC Act § 14(a), to determine whether the MVC had acted unreasonably or in an arbitrary and capricious manner.  Tisbury Fuel Serv., 68 Mass. App. Ct. at 777.  I will take the same approach here.
2. The Commission’s Decision
            Although the Decision on appeal here consists of 17 pages, its substantive findings are found in four of those pages.  See Exhibit 1 at 12-16.  
a. The Commission’s Findings under MVC Act §14
            Of the five findings required by MVC Act §14 before the Commission can approve a development, two are not relevant here.  First, as the Commission accurately stated in its Decision, the Property is not “located in whole or in part within a designated district of critical planning concern,” and so MVC Act §14(d) is irrelevant.  See Decision at 16.  Second, because the proposed development qualified as a Development of Regional Impact, and MVC Act §14(e) applies only to a development referred to the Commission even though it “does not qualify as a development of regional impact,” that section becomes irrelevant.  That is probably why 14(e) is not mentioned in the Decision.  
            As to the remaining three required findings, the Commission found no fault with the development under MVC Act § 14(c), concerning whether “the proposed development is consistent with municipal development ordinances and bylaws. . .”  The Commission found in one sentence that the proposal was consistent with such by-laws, “to the best to the Commission’s knowledge,” and that “the townhouse component of the project would have been subject to Special Permit review under a local Zoning By-Law for cluster developments.”  Decision at 15.  The Commission’s finding of consistency with Edgartown bylaws was supported in the record by a letter from the Edgartown Planning Board chair urging the Commission to approve the development.  See Exhibit 107.
            The Commission declined to make the finding required by MVC Act §14(b), that “the proposed development will not substantially or unreasonably interfere with the achievement of the objectives of the general plan of any municipality or the general plan of the county of Dukes County.”  The Commission’s contrary finding focused only on the county’s general plan, without mentioning the municipality’s plan.  That finding stated, in one sentence, the following: “the proposed project, as a whole, does not advance the Commission’s land development objectives, as outlined in the Martha’s Vineyard Commission Regional Policy Plan adopted by the Commission in June 1991 and the Island Plan adopted by the Commission in December 2010, including in respect of the location and the type of housing proposed.”  Decision at 15.   
            The Decision makes clear that the Commission’s negative finding under §14(b) springs directly from its much more fully explained negative finding as to the remaining provision of §14, which asks whether “the probable benefit from the proposed development will exceed the probable detriment as evaluated pursuant to section fifteen.”   MVC Act §14(a).  After conducting this balancing test, the Commission found that “the probable detriments of the proposed development will exceed the probable benefits, as evaluated in light of the considerations set forth in Section 14(a) of the Act.”  Decision at 12.  
b. The Commission’s Application of MVC Act §15
            In applying MVC Act § 14(a), the MVC must “evaluate[] [probable detriments and probable benefits] pursuant to section 15.”  MVC Act § 14(a).  Section 15, in turn, requires the Commission to consider eight non-exclusive factors.  MVC Act § 15(a)-(h).  The Commission made findings as to each of these § 15 factors.  I will now briefly describe the Commission’s conclusions as to these factors, and make Rulings of Law about the adequacy of those conclusions.
            As to one – and only one – of these eight factors, the Commission found an overall beneficial impact: “the proposed development would have a beneficial impact upon the supply of needed low- and moderate-income housing for Island residents (Section 15(d) of the Act).”  Decision at 14 (emphasis in original).  The Commission was worried, however, “that the proposed durational residency requirements would have violated Affirmative Fair Housing policies,” Decision at 14, and noted that the financial contributions to affordable housing were to be spread over time, “resulting in payments being made many years in the future.”  Decision at 14. 
            In “measur[ing] the legal sufficiency of the Commission decision against the court’s findings of fact rather than against those found by the Commission,” as required by Tisbury Fuel Serv, 68 Mass. App. Ct. at 776, I rule that the Commission’s MVC Act Section 15(d) finding of a positive impact on the supply of affordable housing is supported by the facts I have found above, concerning both the 14 townhouse units and financial contributions to affordable housing programs proposed by Meeting House.  The Commission’s concern about the legality of imposing 5- and 15-year residency requirements for Qualified Buyers of the townhouses was correct as a matter of law as well.  See Massachusetts Department of Housing and Community Development Affirmative Fair Marketing and Resident Selection Plan Guidelines § D-3-C (May 2013) (requiring that “all privately assisted housing” shall have an Affirmative Fair Housing Marketing and Resident Selection Plan, which would, among other things, require a justification for any preference given to local residents, and limit any such preference to a maximum of 70% of the affordable units); cf. Zoning Bd. of Appeals of Sunderland v. Sugarbush Meadow, LLC, 464 Mass. 166 (2013) (for housing to be included on a town’s subsidized housing inventory, the affirmative fair marketing plan must include a provision for “effective outreach to protected groups underrepresented in the municipality”).
            As to another of the eight Section 15 factors, the Commission found a “mixed impact,” in this case “on the provision of municipal services or burden on taxpayers . . . (Section 15(e) of the Act).”  Decision at 14 (emphasis in original).  The Commission’s one-sentence explanation was that the development would provide increased tax revenues but also place a demand on services.  Decision at 14.  Meeting House presented testimony of a planning expert who said, in conclusory fashion, that Edgartown would spend only $.20 of each tax dollar from the Meeting House project on “non-school municipal services,” presumably the services required by the residents of the Meeting House development.  Testimony of Roberta Cameron, Tr. 2 at 2-231.  The Commission presented little or no evidence at trial about either side of the tax revenues/demand on services calculus.  Because the factual record was so thin on this point, I have made no findings of fact on this question.  As a result, in measuring the legal sufficiency of the Commission decision against my findings of fact, I rule that the Commission’s conclusion of a “mixed impact” under MVC Act §15(e) is unsupported.
            In contrast to its one positive impact finding and its one mixed impact finding, the Commission found detrimental impacts as to each of the other six Section 15 factors.  
            In applying MVC Act §15(g), the Commission concluded that the proposed development would interfere with the ability of the Town of Edgartown to achieve some of the objectives set forth in its general plan.  The Commission explained this conclusion in two sentences.  While conceding that Edgartown had zoned the Property for residential development, the Commission nonetheless found that the proposal “would not achieve true mixed-income integration as envisioned by the Master Plan,” Decision at 15, without citing any particular provision to this effect in the Edgartown master plan.  In the absence of any evidence at trial, and therefore in the absence of findings of fact on this question, I rule that this Commission conclusion is neither sufficient nor supported at trial.
            Similarly brief was the Commission’s application of MVC Act §15(f), which asks whether a proposed development “will use efficiently or burden unduly existing public facilities or those which are to be developed within the succeeding five years.”  Here the Commission focused entirely on sewer capacity, noting that the existing sewer system “is adequate to accept the flow from the project,” but complaining about the “opportunity cost to the allocation of sewer capacity to the proposed 140 bedrooms in the luxury home development, as it will use capacity which might otherwise be used for demonstrated housing needs, hastening the need for additional costly sewer infrastructure.”  Decision at 15.  In other words, rather than allocate currently available sewer capacity to the proposed Meeting House development, the Commission wanted to preserve that capacity for future use by some hypothetical, otherwise unspecified less-expensive form of housing.  The Commission’s Decision makes no reference to the five-year timeline mentioned in §15(f), and for that reason alone its Section 15(f) conclusion must be overturned as an error of law.  As to the facts, the Commission introduced no evidence at trial credibly suggesting that the sewer system would need to be expanded in the near future.  As a factual matter, therefore, I rule that the Commission’s conclusion under MVC Act §15(f) about the negative impact of the Meeting House proposal on sewer system “opportunity cost” is unsupported by (and in some ways contrary to) the evidence at trial. 
            As to “impact upon the environment,” MVC Act §15(b), the Commission found an overall detrimental impact.  The Commission noted a slight negative impact on the Edgartown Great Pond, despite the plans of Meeting House to connect its own residences, and certain other neighboring residences, to the sewer system.  The Commission noted storm water runoff from paving Division Road and from driveways on the Property, without noting that homeowners would be required to use low-nitrogen fertilizer, if any.  The Commission criticized the “significant clearing of land that serves to sequester carbon dioxide” and that provided “conditions important for flora and fauna.”  Decision at 13.  And, despite the “good precedent” set by “on-site renewable energy generation,” the Commission noted that the residences would use considerable amounts of propane, thereby contributing to greenhouse gas emissions.  To the extent that the Commission’s Section 15(b) conclusion was based on impacts on the Edgartown Great Pond, I find it to be unsupported by the facts as I have found them.  To the extent that this conclusion was based on alleged detriments caused by the use of propane, I find it to be contrary to the parties’ stipulation that energy was not a factor in the Commission’s decision to deny approval to the project.  On the other hand, to the extent that the Commission based its conclusion under MVC Act § 15(b) on clearing of trees and fragmentation of habitat, that finding is supported by my findings of fact based on the evidence at trial.
            The Commission also found detrimental effects as to the remaining three provisions of MVC Act § 15, namely MVC Act §§ 15(a), (c) and (h).  Because each of those three Commission findings springs from its fundamental unhappiness with the nature of the Meeting House proposal, I will consider the Commission’s handling of these three remaining provisions of Section 15 together.  
            The overarching basis for the Commission’s decision to deny its approval to the Meeting House proposal is found in its discussion of MVC Act §15(a), which directs the Commission to consider whether “development at the proposed location is or is not essential or especially appropriate in view of the available alternatives on the island of Martha’s Vineyard.”  The Commission found that the Meeting House development would create “overwhelming detriment to the rural, natural character of the area, and the Vineyard as a whole.”  Decision at 12.  “[A]lthough the project satisfied in some form many of the MVC guidelines, it did not provide sufficient benefits to outweigh the overwhelming detriment,” the Commission concluded.  Decision at 12.  
            The Commission noted that it “had concerns about character regarding the project from the beginning,” Decision at 12, and, despite being “reworked by the Applicant on several occasions,” nonetheless in its final form “the project remained out of character.”  Decision at 12.  The Commission specifically criticized the proposed home sizes of typically five bedrooms and 3600 square feet of living space, with the possible additional 400 square feet of living space above a detached garage.  Also of concern was “the general scope and layout of the project.”  Decision at 12.  “With its focus on five-bedroom houses, the development prioritizes homes that would be primarily affordable to seasonal residents, not year-round islanders, which is the Island’s most pressing housing need.”  Decision at 12.  The Commission further stated that the proposed houses “would be significantly larger than most other homes in the surrounding R-20 District, where the average home size built over the last decade is 2777 square feet on half-acre lots.”  Decision at 12. 
            Even the affordable townhouses, while “laudable,” were “a poor fit for aging residents,” because they were not in walking distance of downtown Edgartown.  Moreover, “the vague income eligibility parameters and built-in cost escalators suggest that these units may not be truly affordable.”  Decision at 12.
            For similar reasons, the Commission found a detrimental “effect upon other persons and property.”  MVC Act §15(c).  Here the Commission focused generally, although not exclusively, on the fact that Meeting House proposed to build large homes on cul-de-sacs, which “does not convey a rural feel or look.  With the road layout and lots being occupied by large homes that cover much of lot area, the development is far more suburban than rural in character.”  Decision at 13.  Moreover, the Commission said, cul-de-sacs are “emblematic of many high-end suburban subdivisions which do not reflect the traditional character of the Island.”  Decision at 13.  With its homes being “substantially larger than the average home size in the same zoning district, the proposal would defy a more typical, mixed island neighborhood income distribution, and rather would promote a demography that is somewhat compartmentalized.”  Decision at 13.  In this way, the proposal “contradicts an explicit aim of the Edgartown Master Plan, which espouses a desire for more integration of housing types.”  Decision at 13.
            Along the same lines was the Commission’s conclusion as to MVC Act §15(h), which asks whether “the proposed development will further contravene land development objectives and policies developed by regional or state agencies” – the regional agency here being the Commission itself.  The Commission conceded that the Property was “located in an area assessed as Somewhat Suitable for Development in the Island Plan,” the most recent regional planning document published by the Commission.  Decision at 15.  Nonetheless, the Commission stated, “a significant part of the proposal resembles growth for growth’s sake, a strategy questioned in the Plan.  The Island Plan also maintains that the island is rapidly approaching its carrying capacity, and large developments, particularly those that are out of character with the Island, must provide substantial benefit.”  Decision at 15.  The Commission concluded by expressing a wish to avoid the “experience of overdevelopment on Cape Cod.”  Decision at 15.  The Meeting House Proposal would result in “impacts of overdevelopment [that] will be detrimental to the Island in the longer term.”  Decision at 15.
            Because the Commission viewed the Meeting House proposal as an inappropriate form of development – a view it expressed most openly in discussing MVC Act §§ 15(a), (c), and (h) – the Commission stated its core finding as follows: “In sum, the Commission finds that the development would commit significant acreage towards luxury homes in a suburban setting, which would not be a prudent use of the island’s dwindling supply of remaining developable land.”  Decision at 12.  It now falls to me to determine the legal sufficiency of this core basis for Commission’s decision when measured against my findings of fact after trial.  Tisbury Fuel Serv., 68 Mass. App. Ct. at 776.
3. Analysis
            Meeting House contends that the Commission has no authority to deny approval to its proposal based on an unwelcoming attitude toward luxury housing likely to be purchased by off islanders.  Meeting House is correct that the Commission denied its application at least in part based on this attitude.  The Commission most clearly stated this point of view in finding “overwhelming detriment to the rural, natural character of the area, and the Vineyard as a whole.”  Decision at 12.  As the Decision itself states, “although local zoning would permit a residential development in this area of Edgartown . . . With its focus on five-bedroom houses, the development prioritizes homes that would be primarily affordable to seasonal residents, not year-round islanders, which is the Island’s most pressing housing need at this time.”  Exhibit 1, Decision, at 12.  
            The primary issue on appeal is whether the Commission exceeded its statutory mandate if, indeed, it denied the Meeting House application based on its distaste for the size and cost of the houses and the style of the proposed Meeting House development.  Before reaching that question, though, I will discuss the validity, based on facts I have found, of the Commission’s conclusions concerning other detriments and benefits.
A. Other Detriments and Benefits Cited by the Commission
            The Commission did cite other detriments that, in its view, outweighed any benefits of the Meeting House development.  As more fully described above, most of these alleged detriments were not supported in the facts that I have found.  An example of such an unsupported finding is the Commission’s conclusion under MVC Act § 15(f) that the wastewater disposal needs of the development would unduly burden Edgartown’s wastewater treatment system.  The Commission’s concern under MVC Act § 15(b) about the development’s potential addition of nitrogen to Edgartown Great Pond was similarly unsupported.  The discussion above points out other areas in which my findings of fact did not support the Commission’s conclusions about detriments.
            As to the other side of the MVC Act balance, the benefits provided by the Meeting House project design, the Commission argues that Meeting House should not get credit for benefits that were already “substantially required.”  Commission’s Post-Trial Brief at 42.  A good example of the Commission’s ungenerous attitude in this regard is found in its argument that the habitat preservation benefits of the Meeting House plan were “illusory.”  Id.
            As the Commission points out, the decision of the Massachusetts Natural Heritage and Endangered Species Program to designate part of the Property as Priority Habitat for the Imperial Moth would have required Meeting House to preserve “at least 20.2 acres of the protected area [to avoid] trigger[ing] a lengthy and burdensome regulatory process.”  Commission’s Post-Trial Brief at 42.  Yet the Meeting House reaction to this Priority Habitat designation was to create a 30.1-acre “Open Space” lot, not a 20.2-acre lot.  The Commission is equally dismissive of development’s provision of a 200-foot landscape buffer zone along Meeting House Way, pointing out that this buffer zone is already required by a deed.  Id. at 43.  Again the Commission is correct, but again the Commission ignores that Meeting House went beyond its legal obligation, by offering to create a wooded buffer zone along Meshacket Road, the other public way close to the Property.  Nor does the Commission give Meeting House credit for preserving another 9.2 acres of habitat by imposing no-build zones between the residential lots.
            Similarly, the Commission argues that Meeting House provided no environmental benefit by connecting its development to the Edgartown wastewater treatment system, because such a connection would have been required of any development on the Property.  Id. at 43-44.  But again Meeting House went further than this, offering to connect to its sewer lines 7 to 12 neighboring houses that currently employ septic systems, and offering to allow Edgartown’s 40 planned affordable units across Division Road to hook into the Meeting House system as well.  This, too, does not qualify as a benefit, the Commission argues, because the Commission’s Water Quality Policy “aims to reduce nitrogen offloading from DRI developments.”  Id. at 44.  In other words, the Commission is suggesting that Meeting House is not providing any environmental benefit by offering to connect, for free, up to 52 additional housing units (more than the total number of units to be constructed on the Property, and well above the number of market-rate units) to the Edgartown wastewater treatment plant, because Meeting House would have been required to do something to “reduce nitrogen offloading.”  This crabbed argument fails as a matter of logic, and as a matter of law.
            But to be fair to the Commission, my findings of fact do support some of its conclusions about detriment that are unrelated to its general unwelcoming attitude toward the proposed construction of large and expensive houses on the Property.  For example, I have found facts that support the Commission’s decision that the 9.2 acres contained in no-build zones between the house lots provide little benefit to wildlife, and in fact these fragmented “wild” areas are actually detrimental to fauna and insects drawn to them and thereby endangered by paved areas and open lawns.  I also found that the considerable clearing of forest land would be an environmental detriment, as the Commission suggested.
            Most notably, my findings of fact also support the Commission’s conclusion that, while a well-designed proposal for 14 affordable townhouses would have a beneficial impact upon the supply of affordable housing for island residents, Decision at 14, the Meeting House proposal “was the genesis of a good idea that was incomplete and infeasible as proposed,” as the Commission now puts it.  Commission’s Post-Trial Brief at 37.  I agree that the Meeting House proposal was unworkable for several reasons, both factual and legal.
            As described in my Findings of Fact, the Meeting House proposal set initial sales prices for the affordable units to make the units affordable to persons in the Martha’s Vineyard “workforce” – that is, lower wage workers earning a certain percentage of the Area Median Income on Martha’s Vineyard.  But, despite this admirable goal, Meeting House proposed no income or asset tests for initial buyers, instead limiting eligibility to persons who were either: (1) 60 years old, had lived on the island for 15 years, and did not own real property at the time of application; or (2) first-time homebuyers who had lived and worked on Martha’s Vineyard full-time and year-round for at least five years.  Nor did Meeting House include any mechanisms, such as deed restrictions, for maintaining affordability of the units in future transactions.  As a result, Meeting House would have been free to sell an affordable unit to the richest 60-year-old long-term resident of Martha’s Vineyard after that person sold his or her current home.  That wealthy buyer then would have been free to resell the unit to anyone, regardless of whether this next buyer met the definition of Qualified Buyer.  Thus, the Meeting House proposal was factually unworkable.
            That proposal was also legally deficient.  The parties have agreed, and I have found, that the qualifications required of a Qualified Buyer “do not fit state and federal guidelines for affordable housing, which do not allow age and residency restrictions.”  Statement of Agreed Facts ¶ 53.  Such state and federal guidelines are intended to prevent discrimination in the allocation of affordable units.  Age discrimination is an obvious problem with the definition of Qualified Buyer.  More subtle, but no less real, is the racially discriminatory effect of drawing all Qualified Buyers from a pool of long-time Martha’s Vineyard residents, a population that is less diverse than the Massachusetts population in general.  
            Meeting House has frankly admitted that its only reason for (eventually) offering to build and sell affordable units was to obtain the approval of the Commission.  Meeting House does not dispute the existence of these factual and legal infirmities, but rather considers these matters to be details that could be worked out with the appropriate town officials during its post-Commission subdivision approval process before the Edgartown Planning Board.  
            This approach, however, is wrongheaded.  When the MVC Act requires an applicant to present a proposal to the Commission, the applicant bears the burden of presenting a full and workable proposal, not a proposal that might be modified to become workable during a later local permitting proceeding.  Apparently recognizing this reality, Meeting House did in fact consult with town officials, including the Edgartown Affordable Housing Committee, and those conversations did bear some fruit, such as the proposed prices of the affordable units.  But the Commission was not required to take the word of Meeting House that it would later add to its affordable housing provisions such things as buyer income or asset limitations, or resale provisions made enforceable by deed restrictions, or a legally sufficient fair marketing plan.  As a result, the Commission was generous in finding under MVC Act § 15(d) that the Meeting House proposal would have a beneficial impact upon the supply of low- and moderate-income housing for island residents (a finding based not only on the offer of the affordable units, but also on Meeting House’s proposed financial contributions), even while expressing some worry about the legality of the durational requirements.  Decision at 14.
B. The Commission’s Finding that Development of Five-Bedroom Houses Primarily Affordable to Seasonal Residents Was an Overwhelming Detriment
            Having treated other findings of the Commission under MVC Act §§ 14 and 15, I turn now to the central issue in this appeal.  Meeting House argues that the Commission denied approval because the development “would commit significant acreage towards luxury housing in a suburban setting,” and by “prioritiz[ing] houses that would be primarily affordable to seasonal residents, not year-round islanders,” it would result in an “overwhelming detriment to the rural, natural, character of the area, and the Vineyard as a whole.”  Plaintiff’s Corrected Post-Trial Brief and Final Argument at 20, quoting Decision at 12.  If this was the central reason for the Commission’s denial – and my findings of fact suggest that it may well have been – did the Commission exceed its statutory authority?
            That authority comes from the MVC Act.  In creating the Commission as a nearly unique regional planning entity, the state legislature gave the Commission broad, and vague, responsibilities: to protect the health, safety and general welfare of island residents and visitors by preserving and conserving for the enjoyment of present and future generations the unique natural, historical, ecological, scientific, and cultural values of Martha’s Vineyard which contribute to public enjoyment, inspiration and scientific study, by protecting those values from development and uses which would impair them, and by promoting the enhancement of sound local economies.
MVC Act § 1.  Even while citing and relying on this general language in the introductory paragraphs of the MVC Act, the Commission was careful to tie its permitting decision to the much more specific provisions in MVC Act §§ 14 and 15.
            With regard to MVC Act §14, the Commission has declined to make two of the five specific findings that it must make, the statute says, before it can issue an approval.  First, applying MVC Act §14(b), the Commission found that the development would substantially or unreasonably interfere with the achievement of the Commission’s general plan.  Second, in deciding that the probable detriments of the development would outweigh the probable benefits under MVC Act § 14(a), the Commission specifically weighed the eight interests laid out in MVC Act § 15, as the legislature has instructed.
            So the question becomes whether the detriments on which the Commission so heavily relied – 28 large houses, laid out in “suburban” style, at this particular location, likely to be purchased primarily by off islanders – are appropriate matters for the Commission to have considered.  The MVC Act does not answer this question.  I turn, therefore, to the sparse case law interpreting that Act, and otherwise discussing limitations on development of Martha’s Vineyard imposed in zoning laws.
            Just a few years into the life of the Commission, the Supreme Judicial Court discussed the genesis of the MVC Act and the Commission in Woods Hole Martha’s Vineyard & Nantucket S.S. Auth. v. Martha’s Vineyard Comm’n, 380 Mass. 785 (1980).  Of particular relevance here is the court’s observation that “[t]he commission was created in response to studies which predicted that, unless action was taken, the unique natural, cultural and historical beauty of the Nantucket Sound islands would be lost in the quest for private development, particularly for the second home market.”  Id. at 788.  Meeting House, of course, is attempting to engage in “private development, particularly for the second home market.”  Woods Hole suggests, then, that the MVC Act empowers the Commission to consider as a detriment that the proposed Meeting House development is likely to attract second home buyers rather than current islanders.
            Just three months before issuing its Woods Hole decision, the Supreme Judicial Court decided Sturges v. Town of Chilmark, 380 Mass. 246 (1980), a case concerning a different sort of government regulation of development on Martha’s Vineyard.  Although the Commission was not a party to Sturges, the court prominently mentioned the Commission and the MVC Act, and the court’s reasoning is relevant here.  
            Sturges was a challenge to a “rate of development” zoning bylaw enacted by a town on Martha’s Vineyard that restricted how many building permits the town would issue in a given year.  The court recognized that Chilmark was a substantially rural town attempting “to preserve its character or at least guard against unforeseen, adverse consequences of too rapid development.”  Id. at 254.  One effect of the rate of development bylaw, the court said, was to “partly ‘clos[e] the doors’ to affluent outsiders primarily seeking vacation homes.”  Id. at 255.  But that was fine with the Supreme Judicial Court: “Whatever undesirable economic and social consequences inhere in partly ‘closing the doors,’” the court said, were outweighed by “the public interest in preserving the environment and protecting a way of life.”  Id.  “The island of Martha’s Vineyard has unique and perishable qualities,” id. – as the legislature had recently recognized, the court pointed out, by enacting the MVC Act and creating “a statutory commission to assist in th[e] preservation” of the natural, historical, ecological, scientific, or cultural values of Martha’s Vineyard.  Id. at 256.  The Sturges court found no problem with the rate of development bylaw because it was not “designed to exclude persons from acquiring places of permanent residence,” but rather simply constituted “a partial and annually relaxing restriction on the construction of what will the most part be second, or vacation, homes.”  Id. at 259-260 (emphasis added).  Thus Sturges, too, suggests that restrictions on the construction of second homes are justifiable in the unique circumstances of a community on Martha’s Vineyard threatened with too-rapid second-home development.
            Elsewhere the Supreme Judicial Court has made clear that the Commission’s review of subdivisions designated as Developments of Regional Impact is “central to the comprehensive regional scheme” embodied in the MVC Act.  Crocker v. Martha’s Vineyard Commission, 407 Mass. 77, 83 (1990).  In performing that review here, as permitted by Woods Hole, the Commission expressly considered that Meeting House was proposing large and expensive homes that, realistically speaking, would primarily serve the second home market.  Indeed, the MVC Act itself required the Commission to consider the proposal’s effect on “the supply of needed low- and moderate-income housing for Island residents.”  MVC Act § 15(d).  In performing that analysis, and expressing a preference against using the Property for vacation homes rather than for permanent residences for islanders, the Commission was applying reasoning similar to that of the Supreme Judicial Court in Sturges.  
            Another echo of Sturges is found in the Commission’s concern about what it calls a “suburban” style of development in a part of the island that it characterizes as largely rural.  See Sturges, 380 Mass. at 254 (approving a zoning bylaw imposed by a “substantially rural” Vineyard town “which wants to preserve its character”).  The Commission is slightly exaggerating the rural nature of the neighborhood of the Property, given that there are several large subdivisions in the vicinity that predate the era of Commission review.  But it is also true that the area to the south of the Property across Meeting House Way is zoned for three-acre lots and is currently only lightly developed.  In addition, the land directly across Division Road to the west of the Property is largely undeveloped – although development is planned there, including the Town’s proposed 40-unit affordable housing development, which presumably will consist of a housing style that will not be rural in character.  But the Commission is correct that, as of now, the Property is on the edge between “suburban” Edgartown and “rural” Edgartown.
            I am sympathetic to the grievance that inspired Meeting House to file this appeal.  Meeting House spent millions of dollars on a developable Property, which the Commission itself had designated in its most recent Island Plan as Somewhat Suitable for Development.  Meeting House then prepared a proposal for the development of that Property that complied with local zoning and with many of the policies of the Commission, and Meeting House obtained considerable support from officials of the Town of Edgartown for its plans.  And yet Meeting House found itself before a regional planning agency that disliked the size and style of its planned subdivision and the likely audience for the proposed lots, and therefore prevented it from seeking permits – permits that it believes it would have successfully obtained – from the Town of Edgartown.  
            But the legislature created that regional planning agency specifically to protect “unique natural, historical, ecological, scientific, cultural, and other values” that make Martha’s Vineyard special.  MVC Act § 1.  Such a regional planning agency was necessary, the legislature further stated, because “[t]hese values are being threatened and may be irreversibly damaged by uncoordinated or inappropriate uses of the land.”  Id.  And the Supreme Judicial Court has suggested that the Commission is entitled to consider the danger that “the quest for private development, particularly for the second home market,” poses to “the unique natural, cultural and historical beauty” of Martha’s Vineyard.  Woods Hole, 380 Mass. at 788.  
            This case is made more difficult by the fact that the Commission strained for reasons to deny Meeting House the right to build its development, supporting its denial with some reasons that I have found unsupportable as a matter of fact.  But certain other bases for the Commission’s Decision – including its concern about the use of the Property for large homes likely to be purchased as vacation residences – were factually justified.  Even while recognizing that neither the MVC Act nor the case law specifically address the key question here, I have ruled that the Commission is legally entitled to base its Decision on this concern. 
            This “court must affirm the [Commission’s] decision unless it finds that denial of the application was ‘based on a legally untenable ground, or [was] unreasonable, whimsical, capricious or arbitrary.’”  Tisbury Fuel Serv., 68 Mass. App. Ct. at 776, quoting MacGibbon, 356 Mass. at 639.  Applying that standard, I conclude that the facts I have found based on the evidence at trial, and the rulings of law I have made based on those facts, require me to affirm the Decision.[6]
Order for Judgment
            Based on these Findings of Fact and Rulings of Law, JUDGMENT SHALL ENTER affirming the decision of the Defendant Martha’s Vineyard Commission.    
 
/s/Paul D. Wilson Justice of the Superior Court
 
April 20, 2023
 
-------------------------------------
 
[1] The southern boundary of the Property runs roughly, but not directly, east-west.  Nonetheless, for convenience, I will refer to Meeting House Way as running along the "southern boundary" of the property, and I will be similarly imprecise, but only slightly so, in referring to the "western boundary" of the property along Division Road, and the other two boundaries as well.  
 
[2] In these Findings of Fact, when I state that the parties "agree" on a fact, I am making a finding of fact to that effect.  
 
[3] In these Findings of Fact, generally I will cite to specific evidence, such as the agreed fact I cite here, only when I am quoting from the evidence, or if I think that the reader may benefit from reviewing the exhibit on which I base a finding.
 
[4] This abbreviation refers to the transcript of the fourth day of trial at page 21.  I will use this shorthand when citing to testimony.
 
 [5] The legislature made a minor amendment in 1979, which is irrelevant to this appeal.
 
[6] In one of its post-trial filings, Meeting House discusses the constitutional prohibition on the government taking private land without paying just compensation.  Plaintiff's Corrected Post-Trial Brief and Final Argument at 22-24.  But, as Meeting House correctly observes, " Whether the Commission must compensate the Plaintiff if its Decision is allowed to stand does not arise in this litigation," id. at 23, and so I do not consider that issue.
 
xxz